STATE of Utah, Plaintiff and Appellant,

v.

A HOUSE AND 1.37 ACRES OF REAL PROPERTY LOCATED AT 392 SOUTH 600 EAST, NEPHI, Utah, Defendant and Appellee.

No. 930481.

Supreme Court of Utah.

Dec. 9, 1994.

Donald J. Eyre, Juab County Atty., Nephi, for plaintiff.

Ronald J. Yengich, Salt Lake City, for defendant.

ZIMMERMAN, Chief Justice:

The State appeals a district court order denying the State's petition, filed pursuant to the Utah Controlled Substances Act,[1] for the forfeiture of a certain house and real property located in Juab County ("the Residence").

The State asserts that in denying forfeiture, the district court made two critical interpretory errors: (i) It concluded that the Residence was not a "housing, warehousing, or storage facility" within the meaning of section 58–37–13(1)(i) of the Code; and (ii) it construed section 58–37–13(1)(i) to require the State to prove, as a predicate to any forfeiture order, that the Residence was used in furtherance of "significant" or "substantial" drug dealing. We reverse the district court's interpretation of section 58–37–13(1)(i) but affirm on other grounds.

We reverse a trial court's findings of fact only if they are "'against the clear weight of the evidence,' thus making them 'clearly erroneous.'" *In re Estate of Bartell*, 776 P.2d 885, 886 (Utah 1989) (quoting *State v. Walker*, 743 P.2d 191, 193 (Utah 1987)). In making such a determination, we view the evidence in a light most favorable to the trial court's findings. We recite the facts in accordance with that standard. *Van Dyke v. Chappell*, 818 P.2d 1023, 1024 (Utah 1991); *Lake Philgas Serv. v. Valley Bank & Trust Co.*, 845 P.2d 951, 953 n. 1 (Utah Ct.App. 1993).

On November 13, 1992, Utah Highway Patrol officer Paul Mangelson stopped Ned Shepherd on Interstate 15 in Juab County. During a search of Shepherd's vehicle, Mangelson found fifteen pounds of marijuana. After Mangelson placed Shepherd under arrest, he contacted officers in the Juab County Sheriff's office and asked if they would like to interview Shepherd. The officers indicated that they would and asked Mangelson to bring Shepherd to the sheriff's office.

During a search of Shepherd's personal effects, the officers found a list of names and telephone numbers. Although most of the individuals on the list were Shepherd's friends and co-workers, the list also included the names of people to whom Shepherd had planned to deliver marijuana. One of the officers noticed that "Kim," the first name on the list, had a Nephi telephone number. The officer believed that the phone number belonged to the respondent in this case, Kim Beddoes; he later confirmed his suspicion by

1. Utah Code Ann. § 58–37–13(1)(i).

looking in the phone book. Apparently, the officers in Juab County were familiar with Beddoes because they told Shepherd "that [Beddoes] was a public nuisance." After some prodding, Shepherd informed the officers that he had known Beddoes for approximately twenty years and that "for all those 20 years they had been dealing in drugs together, using drugs, that sort of thing."[2]

After the interview, the officers asked Shepherd if he was willing to make a controlled delivery to Beddoes. The officers informed Shepherd that he had two choices. If he agreed to make the controlled delivery, they would agree to charge him only with a class B misdemeanor. If he refused to cooperate, however, they would charge him with four felony drug offenses and seek an order forfeiting his house to the State. Shepherd ultimately agreed to make a controlled delivery of marijuana to Beddoes.

After agreeing to make the controlled delivery, Shepherd called Beddoes and said: "Kim, stay there. I'll be over in a second." Shepherd then entered into a discussion with the officers about the proper amount of marijuana to deliver to Beddoes. Although he had not sold Beddoes more than a quarter of a pound "within the last couple years," Shepherd indicated to the officers that "at this time I was going to deliver a pound to him so he didn't have to keep coming back to Utah County." Because it was getting late and the officers did not want to execute the search warrant after dark, they used a prepackaged twenty-three-ounce brick of marijuana from another criminal case.[3]

Once they decided that Shepherd would deliver the prepackaged twenty-three-ounce brick of marijuana, the officers placed an electronic listening device on Shepherd. Shepherd then drove to Beddoes' home and met him in the garage area of the house. After reminding Beddoes that Beddoes still owed him $450 from a prior transaction, Shepherd handed Beddoes the package containing the marijuana. Before he left, Shepherd indicated that Beddoes owed him $1600 for the latest delivery and again reminded him about the $450 due from a previous transaction. The entire meeting lasted approximately one minute.

After the delivery, an officer followed Shepherd back to the Juab County Sheriff's office and obtained a warrant to search the Residence. Officers from the Nephi City Police Department and the Juab and Utah County Sheriffs' offices executed the warrant shortly thereafter. At least three officers entered the Residence through a basement door on the southwest side of the house. The officers saw a shadow of what appeared to be a person on a wall in the basement. They moved toward the shadow and advised whoever "was in there to come out with their hands up." Beddoes walked out of a bathroom and toward the officers with his hands up. The officers then entered the bathroom and found an overflowing toilet that had been stuffed full of marijuana.

At the same time the officers were entering the Residence through the basement door, several officers entered through the front door. They found Annette Beddoes in the kitchen. An officer read Annette her *Miranda* warnings and asked her if she would like to speak with him. According to the officer, Annette informed him that the scales, pipes, and narcotics were kept downstairs at the bar. The officer also testified that Annette confirmed that Beddoes was in the narcotics dealing business and that he conducted his narcotics transactions in the downstairs bar area of the Residence. The

**2.** The district court found, and the State does not dispute, that "no plan [or] conspiracy existed [between] Beddoes and Shepherd prior to the time of the delivery by [Shepherd]. Mr. Shepherd ... went to California to pick up the marijuana [unbeknownst] to any persons in Utah."

**3.** The district court found:
[T]he officers originated the criminal scheme to have the marijuana delivered to Beddoes. They originated the idea; developed the groundwork for Mr. Shepherd to utilize an "old friend" who had purchased quantities from Shepherd in the past. The phone call originating the scheme was [the] act of the police or their informant/agent. The delivery of the substance was made by the police through the informant. The police also determined the quantity to be delivered and the location. The police could have [chosen] to deliver an amount with a value less than $1,000.00. They chose to deliver an amount with a value in excess of $1,000.00.

district court evidently did not find the officer's testimony credible.

The officers then searched the Residence. During this search, they found a pipe containing marijuana residue, electronic scales, Baggies, and a metal tray containing marijuana seeds. All of these materials were located on or around the bar in the basement of the home. After the search, the officers arrested Beddoes and transported him to the Nephi jail. The Juab County Attorney initiated this forfeiture proceeding against the Residence sometime thereafter.

After a bench trial, the Fourth District Court denied the forfeiture and ordered the county to return the Residence to the Beddoes. The district court began its analysis by concluding that as a matter of law, section 58-37-13 must be strictly construed and "considered in the light that the statute is aimed at substantial drug dealers." With this in mind, the district court found that Beddoes was not a "substantial drug dealer" and that the Residence was not used for "any significant drug dealing." The court went on to conclude: "The quantity and circumstances of previous buys indicated the drugs Mr. Beddoes purchased were primarily for personal use. The previous buys were for, at most, four ounces of marijuana with a street value of $400.00." Furthermore, the court found that the officers had originated the criminal scheme and had chosen to deliver more than $1000 worth of marijuana to Beddoes, apparently with the intent of triggering forfeiture provisions contained in the Utah Controlled Substances Act. In light of these facts, the district court concluded that the Beddoes residence was not a " 'housing, warehousing, or storage facility' within the meaning of [section 58-37-13]." The State appeals.

■ We first state the appropriate standard of review. The proper construction of section 58-37-13(1)(i) is a question of law. *See State v. Larsen*, 865 P.2d 1355, 1357 (Utah 1993); *State v. James*, 819 P.2d 781, 796 (Utah 1991). "Accordingly, we grant no particular deference to the district court's rulings but review them for correctness." *World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 259 (Utah 1994);

*accord Ward v. Richfield City*, 798 P.2d 757, 759 (Utah 1990).

■ When faced with a question of statutory construction, we look first to the plain language of the statute. *Larsen*, 865 P.2d at 1357; *Schurtz v. BMW of N. Am., Inc.*, 814 P.2d 1108, 1112 (Utah 1991); *Brinkerhoff v. Forsyth*, 779 P.2d 685, 686 (Utah 1989); *see also Bonham v. Morgan*, 788 P.2d 497, 500 (Utah 1989) (per curiam) ("Unambiguous language in [a] statute may not be interpreted to contradict its plain meaning."). In construing a statute, we assume that "each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable." *Savage Indus., Inc. v. Utah State Tax Comm'n*, 811 P.2d 664, 670 (Utah 1991). "Only when we find ambiguity in the statute's plain language need we seek guidance from the legislative history and relevant policy considerations." *World Peace*, 879 P.2d at 259; *see also Schurtz*, 814 P.2d at 1112 ("We look first to the statute's plain language. Only if we find some ambiguity need we look further."); *Brinkerhoff*, 779 P.2d at 686 (holding that if "statutory language is plain and unambiguous, this Court will not look beyond the same to divine legislative intent").

The plain language of the Utah Controlled Substances Act is clear and unambiguous. We therefore find it unnecessary to resort to legislative history or policy considerations to inform our reading of the statute. The relevant provisions of section 58-37-13(1)(i) read as follows:

(1) The following are subject to forfeiture and no property right exists in them:

. . . ;

(i) all warehousing, housing, and storage facilities, or interest in real property of any kind used, or intended for use, in producing, cultivating, warehousing, storing, protecting, or manufacturing any controlled substances in violation of this chapter, except that:

. . . ;

(ii) an interest in property may not be forfeited under this subsection if the holder of the interest did not know of

the act which made the property subject to forfeiture, or did not willingly consent to the act; and

(iii) unless the premises are used in producing, cultivating, or manufacturing controlled substances, a housing, warehousing, or storage facility or interest in real property may not be forfeited under this section unless cumulative sales of controlled substances on the property within a two-month period total or exceed $1,000, or the street value of any controlled substances found on the premises at any given time totals or exceeds $1,000.

According to the plain import of this provision, *any* interest in real property is automatically subject to forfeiture if (i) it was "used in producing, cultivating, or manufacturing controlled substances," and (ii) the owner of the property interest knew about or willingly consented to the act which made the property subject to forfeiture. Utah Code Ann. § 58-37-13(1)(i)(ii), (iii). A different standard applies, however, if the real property interest is used to facilitate a violation of the act which does not involve the producing, cultivating, or manufacturing of a controlled substance. In that case, the property interest is subject to forfeiture only if (i) "cumulative sales of controlled substances on the property within a two-month period total or exceed $1,000, or the street value of any controlled substances found on the premises *at any given time* totals or exceeds $1,000," and (ii) the owner of the property interest knew about or willingly consented to the act which made the property subject to forfeiture. *Id.* (emphasis added).

The Residence was not used to produce, cultivate, or manufacture a controlled substance. The record clearly indicates, however, that marijuana with a street value in excess of $1000 was found at the residence. Thus, any property interest in the Residence is subject to forfeiture if the owner of that interest knew about or willingly consented to the presence of the marijuana on the property. *Id.*

■ There was some dispute at trial over whether Annette had any interest in the Residence. Although the district court did not resolve this issue, it did find:

Ms. Annette Beddoes had no interest in the controlled substances. She is an innocent party to any transaction between Kim Beddoes and Ned Shepherd. She did not communicate with Mr. Shepherd in any form. She has been dismissed from the criminal action. The District Court ruled that no reasonable cause existed at the preliminary hearing to justify setting the matter over for [arraignment]/trial and ordered the matter dismissed. Her only conduct was that she was present when the State chose to deliver the controlled substance to the Beddoes home.

Because the district court found that Annette did not have any knowledge "of the act which made the property subject to forfeiture" and because the State has not mounted any challenge to these findings of fact,[4] a plain reading of section 58-37-13(1)(i)(ii) mandates that Annette's property interest in the Residence, to the extent that she actually has such an interest, is not subject to forfeiture.[5]

4. In briefing this issue, the State presented the "facts" in a manner most favorable to its position. It failed, however, to explicitly challenge the district court's findings of fact. Even if we could read the State's brief as challenging the trial court's findings, the State has failed to meet its burden on appeal to "marshal the evidence in support of the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be 'against the clear weight of the evidence,' thus making them 'clearly erroneous.'" *In re Estate of Bartell*, 776 P.2d 885, 886 (Utah 1989) (quoting *State v. Walker*, 743 P.2d 191, 193 (Utah 1987)). Absent such an effort, this court "assumes that the record supports the findings of the trial court and proceeds to a review of the accuracy of the

lower court's conclusions of law and the application of that law in the case." *Saunders v. Sharp*, 806 P.2d 198, 199 (Utah 1991) (per curiam).

5. At trial, the State adduced the following testimony concerning Annette's knowledge of her husband's activities: (i) Annette informed the officers, while they were serving the warrant, that "scales, pipes, and narcotics" were kept downstairs at the bar; (ii) Annette informed the officers, while they were serving the warrant, that Beddoes was in the narcotics dealing business and that he conducted his narcotics transactions in the downstairs bar area of the Residence; and (iii) Annette informed officers, at some time prior to the incident in question, that Beddoes was dealing narcotics out of the Residence. Ap-

■ The result is different, however, with respect to Beddoes. The record demonstrates, and the district court did not find to the contrary, that Beddoes knew about and consented to the placement of the marijuana in the Residence.[6] Because Beddoes knew about and consented to the storage of more than $1000 worth of marijuana in his Residence for some given period of time, his interest in the Residence is subject to forfeiture under a plain reading of section 58–37–13(1).

As should be apparent from our discussion above, the fact that Beddoes' interest in the home is subject to forfeiture under the statute has absolutely no impact on whether Annette's separate and distinct interest is similarly subject to forfeiture. Utah Code Ann. § 58–37–13(1)(i)(ii). In those situations where forfeiture is appropriate with respect to some but not all of the property interests in a given parcel of real property, the district court must tailor the forfeiture so that it is limited to those interests so subject. *Id.* § 58–37–13(9)(j).

Despite the fact that Beddoes apparently falls within the language of the statute, the district court, possibly motivated by what it perceived to be egregious conduct on the part of the officers involved, chose to depart from a plain reading of the statute because of its view that "the statute is aimed at substantial drug dealers." Reading the statute in this light, the district court held that forfeiture was not proper under section 58–37–13(1) because Beddoes had purchased the drugs and stored them in his home "primarily for personal use."

■ We find the district court's reading of section 58–37–13(1)(i) untenable in light of that section's clear and unambiguous language. Section 58–37–13(1)(i) plainly provides that the presence of a sufficient quantity of a controlled substance "at any given time" triggers the potential for forfeiture, regardless of its intended use. The law makes no distinction between drugs possessed for sale and drugs possessed for personal use. As long as the quantity reaches the minimum dollar threshold set out in the statute, the property is subject to forfeiture. *Cf. Davis v. State,* 813 P.2d 1178, 1180–81 (Utah 1991) (interpreting Utah Code Ann. § 58–37–13(1)(e) in accord with its plain meaning to allow forfeiture of any conveyance utilized to facilitate simple possession of a controlled substance); *State v. One 1988 Chevrolet Camaro, Utah License No. 655 CTB, Vin No. 1G1FP21S5JL117759,* 813 P.2d 1186, 1187–88 (Utah 1991) (same). While this reading of the statute may at times lead to harsh results, that is apparently what the legislature intended. *See Davis,* 813 P.2d at 1181.

■ Our decision that Beddoes' interest in the Residence is subject to forfeiture under the plain language of section 58–37–13(1)(i) does not resolve the case. Citing the recent Supreme Court decision in *Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), Beddoes argues that a forfeiture under the circumstances of this case would violate the Eighth Amendment prohibition against excessive fines.[7] Because

---

parently, the district court did not find this testimony credible. Even if the district court had found this testimony credible, however, it still would not be sufficient to support the forfeiture of Annette's interest in the Residence, to the extent that she has such an interest. The predicate act upon which the State relies to support forfeiture is the storage on the property, for some period of time, of $1000 worth of marijuana. Accordingly, it is knowledge of that act which the State must prove.

6. Although the district court found that the officers "originated the criminal scheme to have the marijuana delivered to Beddoes," it did not find that the marijuana was secretly placed in Beddoes' residence or that Shepherd forced Beddoes to accept the marijuana. Furthermore, no such

inference can be drawn from the district court's findings of fact and conclusions of law.

7. In a one-sentence paragraph, Beddoes asserts that a forfeiture under the facts of this case would also violate the Utah Constitution's prohibition against excessive fines. Utah Const. art. I, § 9. We decline to address this assertion because Beddoes' brief "wholly lacks legal analysis and authority to support his argument." *State v. Wareham,* 772 P.2d 960, 966 (Utah 1989); *accord First Sec. Bank v. Creech,* 858 P.2d 958, 962 (Utah 1993); *see also* Utah R.App.P. 24(a)(9) (requiring that the argument section of a brief "contain the contentions *and reasons* of the [party] with respect to the issues presented, with citations to the authorities, statutes, and parts of the record relied on" (emphasis added)); *State v.*

a thorough understanding of *Austin* is necessary to our resolution of this issue, we set out that case is some detail below.

Austin was indicted on four counts of violating South Dakota drug laws. He ultimately pleaded guilty to one count of possessing cocaine with intent to distribute and was sentenced to seven years' imprisonment. The United States then filed an in rem action in the federal district court, seeking forfeiture of Austin's mobile home and auto body shop under 21 U.S.C § 881(a)(4) and (a)(7). The district court granted summary judgment to the United States based on the affidavit of an officer that Austin had taken two grams of cocaine from the mobile home to the body shop to consummate a drug deal. In so doing, the district court rejected Austin's argument that forfeiture of the properties would violate the Eighth Amendment's prohibition against excessive fines. The Eight Circuit Court of Appeals affirmed, holding that the Excessive Fines Clause of the Eighth Amendment was inapplicable to civil in rem forfeitures. *United States v. One Parcel of Property located at 508 Depot St., Garretson, Minnehaha County, S. Dak.,* 964 F.2d 814, 818 (8th Cir.1992), *rev'd sub nom. Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993).

The Supreme Court reversed, holding that the Excessive Fines Clause does apply to civil in rem forfeitures. *Austin,* —— U.S. at ——, 113 S.Ct. at 2812. As an essential predicate to this holding, the Court concluded that the Eighth Amendment prohibitions, including the prohibition against excessive fines, apply in both criminal and civil contexts. *Id.* at ——, 113 S.Ct. at 2804–06. According to the Court, the question is not whether the forfeiture is civil or criminal but whether the forfeiture constitutes punishment. *Id.* at ——, 113 S.Ct. at 2806.

Turning to the issue of civil in rem forfeiture, the Court found that "forfeiture generally and statutory in rem forfeiture in particular historically have been understood, at least in part, as punishment." *Id.* at ——, 113 S.Ct. at 2810. The Court rejected the government's assertion that the Eighth

Amendment was not implicated because the statutes in question were, at least in part, remedial. Instead, the Court indicated that " 'a civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.' " *Id.* at ——, 113 S.Ct. at 2812 (quoting *United States v. Halper,* 490 U.S. 435, 448, 109 S.Ct. 1892, 1902, 104 L.Ed.2d 487 (1989)). Because section 881(a)(4) and (a)(7) could not be said to serve solely a remedial purpose, the Court held that "forfeiture under these provisions constitutes 'payment to a sovereign as punishment for some offense,' and, as such, is subject to the limitations of the Eighth Amendment's Excessive Fines Clause." *Id.* at ——, 113 S.Ct. at 2812 (quoting *Browning–Ferris Indus., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 265, 109 S.Ct. 2909, 2915, 106 L.Ed.2d 219 (1989)).

▪ We are persuaded that the analysis in *Austin* applies equally to section 58–37–13(1)(i). As pointed out in *Austin,* "forfeiture statutes historically have been understood as serving not simply remedial goals but also those of punishment and deterrence." *Id.* at —— n. 14, 113 S.Ct. at 2812 n. 14. In addition, as was true of the federal statutes at issue in *Austin,* section 58–37–13(1)(i) contains an "innocent-owner" defense. Utah Code Ann. § 58–37–13(1)(i)(ii). This exemption serves to "focus the provision[ ] on the culpability of the owner in a way that makes [it] look more like punishment, not less." *Austin,* —— U.S. at ——, 113 S.Ct. at 2811. Finally, the *Austin* Court essentially foreclosed any claim that the forfeiture of real property could be viewed as reasonable liquidated compensation to the state for the expense of law enforcement activity and social expenditures related to drug addiction. According to *Austin,* "The value of the conveyances and real property forfeitable under §§ 881(a)(4) and (a)(7) ... can vary so dramatically that any relationship between the Government's actual costs and the amount of the sanction is merely coincidental." *Id.* at —— n. 14, 113 S.Ct. at

*Dudley,* 847 P.2d 424, 426 (Utah Ct.App.1993) ("Mere allusion to state constitutional claims[,]

unsupported by meaningful analysis, docs not permit appellate review.").

2812 n. 14; *see also United States v. Ward,* 448 U.S. 242, 254, 100 S.Ct. 2636, 2644, 65 L.Ed.2d 742 (1980) (holding that "forfeiture of property ... [is] a penalty that ha[s] absolutely no correlation to any damages sustained by society or to the cost of enforcing the law"). In light of the historical understanding of forfeiture as punishment, the focus of section 58–37–13(1)(i) on the culpability of the owner, and the Supreme Court's rejection of the notion that forfeiture is a reasonable liquidated compensation to the state, we conclude that section 58–37–13(1)(i) is punitive, at least in part. A forfeiture pursuant to that section is therefore subject to the limitations of the Eighth Amendment's Excessive Fines Clause.

As a matter of prudence, the *Austin* Court refused to establish a multi-factor test for determining whether a forfeiture is constitutionally excessive. The *Austin* majority preferred instead to "allow the lower courts to consider that question in the first instance." —— U.S. at ——, 113 S.Ct. at 2812. In a separate opinion, however, Justice Scalia asserted that the relevant inquiry for civil in rem forfeitures was not value but was instead "the relationship of the property to the offense: Was it close enough to render the property, under traditional standards, 'guilty' and hence forfeitable?" *Id.* at ——, 113 S.Ct. at 2815 (Scalia, J., concurring in part and concurring in the judgment). According to Justice Scalia:

> [A]n in rem forfeiture goes beyond the traditional limits that the Eighth Amendment permits if it applies to property that cannot properly be regarded as an instrumentality of the offense—the building, for example, in which an isolated drug sale happens to occur. Such a confiscation would be an excessive fine. The question is not *how much* the confiscated property is worth, but *whether* the confiscated property has a close enough relationship to the offense.

*Id.* (Scalia, J., concurring in part and concurring in the judgment). In response to

Justice Scalia's advocacy of what has come to be known as the "instrumentality" test, the *Austin* majority indicated, "We do not rule out the possibility that the connection between the property and the offense may be relevant, but our decision today in no way limits the Court of Appeals from considering other factors in determining whether the forfeiture of Austin's property was excessive." *Id.* at —— n. 15, 113 S.Ct. at 2812 n. 15.[8]

 Taking our cue from the *Austin* majority, we hold that the connection between the property and the offense is not the sole criterion for determining whether a given forfeiture is constitutionally excessive. Nevertheless, any excessive fines analysis should begin with a basic "substantial connection" or "instrumentality" analysis. *United States v. One Parcel Property located at 427 & 429 Hall St. Montgomery, Montgomery County, Ala.,* 853 F.Supp. 1389, 1399–1400 (M.D.Ala.1994) (proportionality review appropriate only after government has established that there is "substantial connection" between defendant property and offense). Unless the state can establish that the defendant property was an instrumentality of crime, any forfeiture of the property is excessive. *Id.*

 Under an instrumentality analysis, "the focus is on the relationship between the property and the offense, i.e., '[w]as it close enough to render the property, under traditional standards, "guilty" and hence forfeitable?'" *Id.* at 1399 (citing *Austin,* —— U.S. at ——, 113 S.Ct. at 2815 (Scalia, J., concurring in part and concurring in the judgment)). The initial burden is on the state to establish a "substantial connection" between the defendant property and the offense. To satisfy this burden, the state must establish a pattern of illegal activities occurring at the defendant real property. *See Austin,* —— U.S. at ——, 113 S.Ct. at 2815 (Scalia, J., concurring in part and concurring in the judgment).

In its findings of fact and conclusions of law, a document which cites *Austin,* the dis-

---

8. We note that the *Austin* majority's decision not to articulate a test has caused substantial disagreement, in both the federal and state courts, over the appropriate test for analyzing whether a forfeiture is constitutionally excessive. *See United States v. One Parcel Property located at 427 &*

*429 Hall St. Montgomery, Montgomery County, Ala.,* 853 F.Supp. 1389, 1397–1400 & nn. 16–19 (M.D.Ala.1994) (noting existence of cases adopting each of following tests: pure instrumentality, pure proportionality, multi-factor, and mixed instrumentality and proportionality).

trict court in the present case explicitly found that Beddoes was not a "substantial drug dealer[ ]" and that the Residence was not "proved to be a house that was used for any significant drug dealing." [9] The court went on to find that Beddoes had never before purchased such a large quantity of marijuana and that Beddoes would not have purchased such a large amount of marijuana but for the actions of the police. Furthermore, the evidence before the district court demonstrates that the last transaction between Beddoes and Shepherd took place, not in the Residence, but in the mountains where Shepherd was hunting. Shepherd also testified that he planned to "deliver a pound to [Beddoes] so he didn't have to keep coming back to Utah County." Accordingly, it appears that the prior transactions between Shepherd and Beddoes took place, not at the Residence, but in Utah County.

Under the undisputed facts as found by the district court, the only connection between the Residence and the marijuana is that it was present at the Residence for Beddoes' personal consumption. We conclude that this connection, standing alone, is not sufficient to render the Residence "guilty" under traditional standards of Anglo–American justice. *Id.* (Scalia, J., concurring in part and concurring in the judgment). Our research has not revealed a single case approving the forfeiture of a family residence based solely on the fact that a controlled substance was present for the personal use of the occupant. *Cf. United States v. One Parcel of Property located at Shelly's Riverside Heights Lot X, McVeytown, Mifflin County, Pa.,* 851 F.Supp. 633 (M.D.Pa. 1994) (refusing to forfeit cabin utilized to manufacture marijuana solely for personal consumption). Accordingly, we hold that the forfeiture of the Residence, under the undisputed facts as found by the district court, is constitutionally excessive.

Because we can resolve the issue before us with reference to a basic instrumentality analysis, it is unnecessary, at this time, to further define the excessive fines analysis. *Austin,* —— U.S. at ——, 113 S.Ct. at 2812. As we indicated above, however, the connection between the defendant property and the offense is the beginning point, rather than

the sole criterion, in determining whether a forfeiture is constitutionally excessive. *See United States v. One Parcel of Real Property, located at 9638 Chicago Heights, St. Louis, Mo.,* 27 F.3d 327, 331 (8th Cir.1994) ("The district court's test did not consider the monetary value of the property, the extent of criminal activity associated with the property, the fact that the property was a residence, the effect of forfeiture on innocent occupants of the residence, including children, or any other factors that an excessive fines analysis might require."). As future cases present situations in which the instrumentality analysis is not dispositive, we can address other factors that may be comprehended by an excessive fines analysis.

The order of the district court denying the State's petition for forfeiture is hereby affirmed.

STEWART, A.C.J., and DURHAM, HOWE and RUSSON, JJ., concur.

---

9. · As set out in footnote four, *supra,* the State did not mount a proper challenge to the district court's findings of fact. Accordingly, we "assume[ ] that the record supports the findings of

the trial court and proceed[ ] to a review of the accuracy of the lower court's conclusions of law and the application of that law in the case." *Saunders,* 806 P.2d at 199.